IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

JUSTIN BRANHAM, JONAS EDMONDS,
DION JOHNSON, NORMAN RANDOLPH,
CAESAR RICE, JEREMY WILLIS, and
STEPHON YATES,

       Plaintiffs,

v.

                                     Civil Action No. 1:22-cv-00437

                                     Judge _____

FEDERAL CORRECTIONAL INSTITUTION
MCDOWELL, FEDERAL BUREAU OF
PRISONS, COLETTE S. PETERS, in her official
capacity as DIRECTOR OF FEDERAL BUREAU
OF PRISONS, and JOHN DOE PRISON GUARDS
1-50 in their individual and official capacities,

       Defendants.

## COMPLAINT

NOW COME Plaintiffs Justin Branham, Jonas Edmonds, Dion Johnson, Norman

Randolph, Caesar Rice, Jeremy Willis, and Stephon Yates (collectively referred to as "Plaintiffs"),

by counsel, Scott S. Segal, C. Edward Amos, II, Jason P. Foster, and The Segal Law Firm, and

William H. Murphy, Jr., Andrew K. O'Connell, Ronald Richardson, and the law firm of Murphy,

Falcon & Murphy, and for their Complaint against Defendants Federal Correctional Institution

("FCI") McDowell, Federal Bureau of Prisons (the "BOP"), Colette S. Peters in her official

capacity as Director of Bureau of the BOP (the "BOP Director"), and John Doe Prison Guards 1-

50 in their individual and official capacities (the "Prison Guards"), state as follows:

## I. The Parties

1.      Plaintiffs are presently and, at all times relevant to this civil action, were incarcerated at the federal correctional facility operated by FCI McDowell, located at 101 Federal Drive, Welch, McDowell County, West Virginia (the "Facility").

2.      Defendant FCI McDowell operates the Facility.

3.      Defendant BOP is the agency of the federal government responsible for the operations of federal prisons, including the Prison Defendants and the Facility. The BOP is headquartered at 320 1st Street NW, Washington, DC 20534.

4.      Defendant BOP Director is responsible for and oversees the operations of FCI McDowell, including the operation of the Facility. The Director is headquartered at 320 1st Street NW, Washington, DC.

5.      Defendant John Doe Prison Guards 1-50 were, at all times relevant to this civil action, employees of the BOP and were assigned to the Facility.

## II. Jurisdiction and Venue

6.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346(b) because Plaintiffs' claims for relief arise under the Eight Amendment to the U.S. Constitution, the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*. (the "FCTA"), and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).

7.      The Court has personal jurisdiction over FCI McDowell because it is located in the Bluefield Division of the United States District Court for the Southern District of West Virginia.

8.       The Court has personal jurisdiction over the BOP and the BOP Director because they are located in the Bluefield Division of the United States District Court for the Southern District of West Virginia.

9. At all times relevant to this civil action, the Prison Guard Defendants were employed by the BOP, were acting within the scope of their employment and were acting under the color of their authority.

10. The Court has personal jurisdiction over the Prison Guards because they were, at all times relevant to this civil action, employed at the Facility and committed the tortious acts alleged below at the Facility.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 1402(b) as all the events giving rise to this civil action occurred in McDowell County, West Virginia and 28 U.S.C. § 1391(e)(1) as Defendants, in their official capacities, are officers and/or agencies of the United States.

12. Plaintiffs were in the process of exhausting their administrative remedies utilizing the process set forth in 28 CFR 542.10, *et seq*. However, prior to completing the required forms, Plaintiffs were instructed by certain John Doe Prison Guards that they were filling out the wrong forms. The John Doe Prison Guards then provided Plaintiffs with SF-95 Forms, the forms required to initiate a civil action under the FTCA, and instructed Plaintiffs to fill out and submit the SF-95 Forms instead. Each of those claims were denied. Plaintiffs are deemed to have exhausted their administrative remedies pursuant to *Ross v. Blake*, 578 U.S. 632, 633, 136 S. Ct. 1850, 195 L. Ed. 2d 117 (2016) (finding an exception to the Prison Litigation Reform Act's requirement of exhaustion of administrative remedies where a remedy is rendered unavailable in certain instances, such as, ". . . when prison administrators thwart inmates from taking advantage of [the administrative procedure] through **machination, misrepresentation**, or intimidation.") (Internal citation omitted) (emphasis added).

### III. Allegations Common to All Counts

13.    Defendants are required by both the United States Constitution and federal law to provide federal inmates, such as Plaintiffs, suitable and adequate medical care.

14.    From about August 8, 2021 until about August 11, 2021, poisonous carbon monoxide gas ("CO") leaked from the piping and/or ducting on a Maxim 3 Water Heater on the fourth level of Housing Unit 3 of the Facility.

15.    The CO release triggered both audible and strobe alarms.

16.    Shortly after the CO leak was detected, employees of FCI McDowell silenced the audible alarms but the strobe alarms remained activated.

17.    Plaintiffs were briefly released into the yard of the Facility (the "Yard") before being returned to their cells.

18.    Almost immediately after their initial exposure, Plaintiffs exhibited obvious signs of acute CO poisoning including, but not limited to, headache, nausea, vomiting, dizziness, malaise, fatigue, muscle aches, slowed mentation, confusion, incontinence and loss of consciousness.

19.    Plaintiffs' CO exposure-related symptoms were readily apparent to the Prison Guard Defendants.

20.    Plaintiffs reported their respective medical conditions to the Prison Guard Defendants.

21.    After their brief release into the Yard, the Prison Guard Defendants returned Plaintiffs to their respective cells.

22.    Upon information and belief, numerous security cameras captured both Plaintiffs' initial CO exposure in their respective cells and the near-immediate manifestation of Plaintiffs' CO exposure-related symptoms after they were briefly released into the Yard.

23.    Between August 16, 2021 and September 15, 2021, Plaintiffs' counsel sent five preservation letters to Defendants requesting, among other things, that all audio and video records related to the CO leak be preserved.

24.    Upon information and belief, the Prison Guard Defendants returned Plaintiffs to their respective cells without properly ensuring that the dangerous conditions in the Facility were corrected.

25.    Due to the Prison Guard Defendants' failure to mitigate the hazardous created by the CO leak, Plaintiffs' exposure to extremely high levels of CO continued over the next several days.

26.    Plaintiffs initially received a cursory medical evaluation and were promptly returned to confinement.

27.    Since their initial exposure, Plaintiffs have received minimal medical treatment and have never been properly medically evaluated.

28.    Plaintiffs' counsel has repeatedly attempted to meet with Plaintiffs but have repeatedly been denied access to the Facility by Defendants.

29.    Lindell K. Weaver, M.D., is medical doctor with decades of experience in evaluating and treating patients who have been exposed to CO. See Affidavit of Dr. Lindell K. Weaver, M.D., attached hereto as **Exhibit 1**.

30.     "CO is a gas produced by incomplete combustion. It is colorless, tasteless, and odorless to human senses. The density of carbon monoxide is slightly less than that of air and it distributes rapidly within spaces, such as rooms or apartments." *Id*.

31.     "CO levels are measured in parts per million (PPM), and several governmental agencies have published maximum exposure levels over a given period of time. They include:

- Occupational Safety and Health Administration (OSHA)
– 50 ppm over 8 hour period
- National Institute for Occupational Safety and Health (NIOSH)
– 35 ppm over 8 hour period
- Environmental Protection Agency (EPA)
– 9 ppm over 8 hour period; outdoor
- World Health Organization (WHO)
– 15 ppm over 8 hour period; indoor"

*Id*.

32.     "Symptoms and signs of carbon monoxide poisoning are dependent upon the ambient carbon monoxide level, the duration of exposure, mass of the individual and comorbidities of the exposed person. At lower, non-lethal levels, common symptoms include headache, nausea, vomiting, dizziness, malaise, fatigue, muscle aches, slowed mentation, and confusion. If ambient levels are sufficiently high, incontinence, unconsciousness or death can follow." *Id*.

33.     "Carbon monoxide damages tissue through several mechanisms:

1)     Hypoxia, carbon monoxide binds to iron molecules within hemoglobin interfering with oxygen delivery to tissues. If hypoxia is enough, cellular necrosis can ensue, as well as local inflammation. The hypoxia can also result in high levels of excitatory amino acid neurotransmitters, which damage connected nerve cells.

2)     Left-ward shift of the oxyhemoglobin dissociation curve, further reducing oxygen availability at the tissue level.

3)     Reduction of cellular adenosine triphosphate production, which contributes to cellular energy deprivation, abnormal function and cellular death.

4) Release of myelin basic protein from myelin coating neuronal axons. The myelin basic protein undergoes adduct formation and attracts inflammatory lymphocytes to the area of damage, which destroy and damage nerve cells

5) Inflammation. - Carbon monoxide causes neutrophils to release oxygen radical molecules which can damage cellular membranes and interfere with protein synthesis.

6) Inflammation – Carbon monoxide causes an increase in peroxynitrite, a highly oxidizing substance that damages endothelium.

7) Inflammation – Carbon monoxide poisoning causes acute changes in blood, including alterations of: acute phase reactants, proteins associated with inflammatory responses (chemokines/cytokines and interleukins), growth factors, hormones, and an array of auto-antibodies.

8) Inflammation – Carbon monoxide triggers elevations of microparticles that activate neutrophils which then cause tissue injury.

9) Apoptosis – Carbon monoxide accelerates apoptosis, or premature, programmed cellular death in the hippocampus of the brain.

10) Release of iron into brain tissue - Iron is toxic if not properly sequestered within the body. Its release can cause intense inflammation and brain tissue destruction."

*Id.*

34. "CO poisoning can result in brain injury, as well as injuries to other organs and tissues. Even patients that have apparent recovery after poisoning can develop problems days, to weeks, months and, even, years later." *Id.*

35. "Those with brain injury from CO poisoning manifest problems like those with adverse sequelae following other types of brain injury, such as trauma." *Id.*

36. "Commonly reported symptoms of patients with sequelae following carbon monoxide poisoning include persistent headaches, dizziness, imbalance, sleep disturbances, cognitive impairments, generally in the domains of short-term memory, executive function and speed of processing, impaired decision-making, affective problems, other neurological sequelae

and frequently complain of pain. Motor and sensory abnormalities can occur, as well as vestibular dysfunction." *Id*.

37.  According to Dr. Weaver:

a.  Carbon monoxide (CO) is poisonous.

b.  Exposure to CO can cause serious and permanent injury to an individual's brain, heart, lungs, eyes, auditory system, and other body tissue.

c.  Individuals with a history of carbon monoxide poisoning need to undergo multidisciplinary medical evaluations following exposure to determine the extent of their injuries and develop a treatment plan.

d.  Curative therapy for carbon monoxide-related brain injury and its associated adverse sequelae does not exist.

e.  Treatment for CO poisoning should be directed to treat specific symptoms, rehabilitation and helping the patient cope and adapt to their disabilities, which are permanent in nature. Cognitive and vocational rehabilitation can be helpful. Psychotherapy and psychopharmacology approaches can be helpful for the affective problems these patients manifest. Headache management by specialist is important for patients with persistent and often refractory headaches. Visual and balance rehabilitation can be helpful. Sleep disorders are common, and management is important. Patients with cardiac injury need assessment and therapy guided by cardiologists.

f.  A failure to appropriately evaluate and treat individuals poisoned by CO will likely result in increased adverse sequela.

*Id*. at pp. 1-2.

## <u>COUNT I – NEGLIGENCE UNDER THE FEDERAL TORT CLAIMS ACT</u>
### (All Defendants in their Official Capacities)

38.  Plaintiffs incorporate all allegations above as if fully restated and re-alleged and Plaintiffs further allege as follows:

39.  Under the Eighth Amendment of the U.S. Constitution, Defendants had a duty to ". . . provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and **must 'take reasonable measures to**

**guarantee the safety of the inmates**,' *Hudson v. Palmer*, 468 U.S. 517, 526-527, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984)." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (some internal citations omitted).

40. Pursuant to 18 USCS § 4042(a): "The Bureau of Prisons, under the direction of the Attorney General, shall - . . . (2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise; provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States; []." *Id*.

41. Defendants breached their constitutional and statutory duties by failing to properly protect and safeguard Plaintiffs from the CO leak.

42. Specifically, Defendants were aware of the CO leak but failed to take appropriate actions to minimize Plaintiffs' exposure to the deadly gas.

43. In fact, despite both audio and strobe alarms, Defendants made the conscious decision to keep Plaintiffs confined in their respective cells instead of evacuating them to a safe environment.

44. Defendants also breached their constitutional and statutory duties to Plaintiffs by failing to ensure that Plaintiffs received proper medical treatment and evaluation after their prolonged exposure to dangerous levels of CO.

45. As a result of these failures, Plaintiffs have experienced ongoing and progressive physical and mental injuries.

## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER THE FEDERAL TORT CLAIMS ACT
### (All Defendants in their Official Capacities)

46.    Plaintiffs incorporate all allegations above as if fully restated and re-alleged and Plaintiffs further allege as follows:

47.    In order to meet their constitutional and statutory duties to Plaintiffs, Defendants must ensure that Plaintiffs are properly medically evaluated and that they receive adequate medical treatment.

48.    Defendants' decision to silence the audible alarm while Plaintiffs were continuously exposed to dangerous levels of CO, along with Defendants' conscious decision to keep Plaintiffs confined to their respective cells was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency.

49.    Defendants acted with the intent to inflict emotional distress and/or acted recklessly when it was certain or substantially certain emotional distress would result from their conduct.

50.    Defendants' actions caused Plaintiffs to suffer emotional distress.

51.    The emotional distress suffered by Plaintiffs was so severe that no reasonable person could be expected to endure it.

## COUNT III – MEDICAL MONITORING UNDER THE FEDERAL TORT CLAIMS ACT
### (All Defendants in their Official Capacities)

52.    Plaintiffs incorporate all allegations above as if fully restated and re-alleged and Plaintiffs further allege as follows:

53.    Plaintiffs have been significantly exposed to CO.

54.    CO is a proven hazardous substance.

55.     Plaintiffs were exposed to dangerous levels of CO through the tortious conduct of Defendants.

56.     As a proximate result of their respective exposures, Plaintiffs have suffered an increased risk of contracting serious latent diseases associated with CO exposure relative to the general population.

57.     The increased risk of disease makes it reasonably necessary for Plaintiffs to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of the exposure.

58.     Monitoring procedures exist that make the early detection of a disease possible.

**COUNT IV – *BIVENS* LIABILITY**
**(Prison Guard Defendants in their Individual Capacities)**

59.     Plaintiffs incorporate all allegations above as if fully restated and re-alleged and Plaintiffs further allege as follows:

60.     "A *Bivens* action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; *See also Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending *Bivens* to Eighth Amendment claims) . . ." *Johnson v. Williams*, 2020 U.S. Dist. LEXIS 219271, 3 (S.D.W. Va. 2020)(some internal citations omitted).

61.     "A *Bivens* action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct." *Johnson* at 3.

62.     "Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under *Bivens* must show the

11

violation of a valid constitutional right by a person acting under color of federal law." *Johnson* at 3.

63.     "The United States Supreme Court has held that an inmate may name a federal officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to *Bivens*. *See Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)." *Johnson* at 3.

64.     The Eighth Amendment of the U.S. Constitution prohibits cruel and unusual punishment.

65.     Furthermore, under the Eighth Amendment of the U.S. Constitution, Defendants had a duty to ". . . provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, **and medical care**, and **must 'take reasonable measures to guarantee the safety of the inmates**,' *Hudson v. Palmer*, 468 U.S. 517, 526-527, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984)." *Farmer*, 511 U.S. 832 (emphasis added) (some internal citations omitted).

66.     "A prisoner may assert a claim of failure to prevent harm under the Eighth Amendment's cruel and unusual punishment clause [] if he can show that 'he is incarcerated under conditions posing a substantial risk of serious harm,' and that prison officials act with ''deliberate indifference'' to inmate health and safety.'" *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)(*quoting Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). *Brown v. King*, 2011 U.S. Dist. LEXIS 103511, 9 (N.D.W. Va. 2011).

67.     "In *Farmer*, the Supreme Court held that, while it left open the level at which the risk of harm to a prisoner becomes a 'substantial risk of serious harm' (*Id*. at n.3), no prison official can be held liable for 'deliberate indifference' to that risk unless he subjectively 'knows of and

disregards' it. *Id*. at 837. In order to possess this level of culpability, 'the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.' *Id*." *Brown*, at 10.

68.     The Prison Guard Defendants violated Plaintiffs' Eighth Amendment rights by failing to prevent the harm Plaintiffs suffered as a result of the CO leak and Plaintiffs' prolonged exposure to CO.

69.     The CO leak at issue in this case posed a substantial risk of serious harm to Plaintiffs.

70.     Plaintiffs were incarcerated under the dangerous conditions caused by the CO leak for a prolonged period of time.

71.     The CO leak triggered both audible and strobe alarms.

72.     CO is commonly known to present serious harm that can result in death.

73.     The Prison Guard Defendants were subjectively aware of the alarms and consciously chose to disregard them, even going so far as to disable the audible alarms.

74.     Upon information and belief, the Prison Guard Defendants were subjectively aware of the dangers associated with CO exposure.

75.     Despite their subjective awareness of these dangerous conditions, the Prison Guard Defendants consciously decided to keep Plaintiffs confined to their cells; guaranteeing their continued exposure to CO.

76.     In order to make a claim for an Eighth Amendment violation for acting with deliberate indifference to a serious medical condition ". . . the plaintiff must show (1) that the medical need was 'sufficiently serious' that a failure to address the need constitutes a deprivation of ''the minimal civilized measures of life's necessities,'' and (2) that, subjectively, the prison

official acted with the required 'culpable state of mind.' *Wilson v. Seiter*, 501 U.S. 294, 297-98, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

77.     "In order for the medical need of an inmate to be 'sufficiently serious' to rise to the level of an Eighth Amendment violation if not properly treated, it must be 'one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990), cert. denied, 500 U.S. 956, 111 S. Ct. 2266, 114 L. Ed. 2d 718 (1991); *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3rd Cir. 1987), cert. denied, 486 U.S. 1006, 108 S. Ct. 1731, 100 L. Ed. 2d 195 (1988)."

78.     "The subjective requirement that prison officials act with a 'sufficiently culpable state of mind,' may be satisfied when a prisoner is able to show deliberate indifference on the part of the defendants. *Wilson*, 501 U.S. at 303. Deliberate indifference is 'something more than mere negligence [but] . . . something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' *Farmer*, 511 U.S. at 835. In effect, the official must actually be aware of the risk of harm, must subjectively assess it as being substantial and serious, and then must deliberately disregard it despite his awareness and assessment of its severity. If the prison official does not subjectively assess the risk as being substantial and serious, he cannot be held liable, notwithstanding any objective irrationality of his assessment. *See Farmer* at 837-844."

79.     The Prison Guard Defendants violated Plaintiffs' Eighth Amendment rights by acting with deliberate indifference to Plaintiffs' serious medical needs resulting from their prolonged exposure to CO.

80.    Plaintiffs' medical needs resulting from their prolonged CO exposure was sufficiently serious that the Prison Guard Defendants' failure to address those needs constitutes a deprivation of the minimal civilized measures of life's necessities.

81.    During the course of their prolonged CO exposure, Plaintiffs exhibited obvious signs of acute CO poisoning including, but not limited to, headache, nausea, vomiting, dizziness, malaise, fatigue, muscle aches, slowed mentation, and confusion.

82.    These conditions were reported to Defendants and observed by the Prison Guard Defendants.

83.    Despite their subjective awareness of both Plaintiffs' prolonged CO exposure and the manifestation of symptoms consistent with CO exposure, the Prison Guard Defendants acted with the required culpable state of mind in failing to procure proper medical evaluation and treatment for Plaintiffs.

84.    The need for proper medical evaluation and treatment for Plaintiffs' prolonged CO exposure was sufficiently serious to rise to the level of an Eighth Amendment violation is one so obvious that even a lay person would easily recognize the necessity for a doctor's attention.

85.    The Prison Guard Defendants' sufficiently culpable state of mind is evidenced by the facts that the Prison Guard Defendants were actually aware of: (1) Plaintiffs' prolonged exposure to dangerous levels of CO; (2) Plaintiffs' manifestation of symptoms of CO exposure; and (3) the cursory medical treatment Plaintiffs received.

86.    The Prison Guard Defendants were actually aware of the risk of harm associated with the failure to provide Plaintiffs with proper medical evaluation and treatment.

87.    Upon information and belief, the Prison Guard Defendants subjectively assessed Plaintiffs' need for proper medical evaluation and treatment as being substantial and serious.

88.     Despite the Prison Guard Defendants' subjective assessment of Plaintiffs' need for proper medical evaluation and treatment, the Prison Guard Defendants deliberately disregarded said despite their awareness and assessment of the severity of Plaintiffs' prolonged CO exposure.

### COUNT V - Relief Requested

89.     Plaintiffs incorporate all allegations above as if fully restated and re-alleged and Plaintiffs further allege as follows:

WHEREFORE, Plaintiffs demand judgment against Defendants for damages as follows:

(1)     Medical and hospital bills for diagnostic and preventative treatment and therapies and for treatment of injuries, both past and future;

(2)     Physical injuries, both temporary and permanent;

(3)     Severe and significant emotional distress, and mental pain and suffering, both temporary and permanent;

(4)     Fear, humiliation, and embarrassment, past and future;

(5)     Annoyance and inconvenience, past and future;

(6)     Loss of physical health and well-being, past and future;

(7)     Loss of enjoyment of life, past and future;

(8)     Disability;

(9)     Compensatory damages;

(10)    Punitive and exemplary damages (against the Prison Guard Defendants only);

(11)    Civil penalties; and

(12)    Such other and further relief as justice requires.

### V. Jury Demand

Plaintiffs hereby demand a trial by jury upon all issues raised herein triable by jury.

**JUSTIN BRANHAM, JONAS EDMONDS, DION JOHNSON, NORMAN RANDOLPH, CAESAR RICE, JEREMY WILLIS, and STEPHON YATES,**

**Plaintiffs,**

**By Counsel:**

/s/ Jason P. Foster
Scott S. Segal (WV Bar I.D. #4717)
C. Edward Amos, II (WV Bar I.D. #12362)
Jason P. Foster (WV Bar I.D. #10593)
**THE SEGAL LAW FIRM**
**A Legal Corporation**
810 Kanawha Boulevard, East
Charleston, West Virginia 25301
Telephone: (304) 344-9100
Facsimile: (304) 344-9105

William H. Murphy, Jr., Esq. (*pro hac vice* admission pending)
Andrew K. O'Connell, Esq. (*pro hac vice* admission pending)
Ronald Richardson, Esq. (*pro hac vice* admission pending)
**Murphy, Falcon & Murphy**
One South Street, 30th Floor
Baltimore, MD 21202
Telephone: (410) 951-8744
Facsimile: (410) 539-6599